Good morning, Your Honors, and may it please the Court, Brendan Duffy on behalf of Appellant Neil Grenning. I'd like to reserve three minutes for rebuttal. Your Honors, this case arises from prison officials censoring Mr. Grenning's attempt to publish a short story in a prison writing class. The story was approved by his instructors and recommended for publication, but officials blocked it from leaving the prison because it might lead to negative publicity and later threatened to remove him from the program if he tried to submit it himself. The District Court rejected Mr. Grenning's First Amendment claims at summary judgment, but it did so based on three key errors. First, the Court applied the wrong legal standard. Outgoing prisoner speech is governed by Martinez, not Turner. This Court said in Barrett v. Bellock that applying the wrong legal standard to outgoing speech is itself reversible error. Second, Superintendent Key's written threat to remove Mr. Grenning from the program for attempting to publish his story is textbook retaliation under this Court's decision in Brodheim. And finally, the District Court's errors go far beyond the merits. It granted summary judgment despite genuine disputes of material fact, failed to consider Mr. Grenning's timely opposition brief, and denied discovery that would have revealed whether any policy actually authorized this censorship. In short, this Court should reverse and enter judgment for Mr. Grenning on his First Amendment claims or at minimum vacate and remand for application of the correct legal standard. So, Counsel, you mentioned that the reason it was rejected was because of the reputational harm to the prison. It doesn't seem like the prison is defending that justification on appeal, and they're suggesting it's more of a rehabilitation purpose. What are we to do with that? Your Honor, I don't think you can do that under Martinez. Martinez is heightened scrutiny. As this Court knows, when we are doing heightened scrutiny, we look at what the defendants in this case provide in the record. There's only two reasons that the government provided in the record. This is ER 104, Ms. Weiss said she was attempting to enforce third-party publication criteria, and ER 113, this is Superintendent Key saying he was worried about negative publicity. Those are the only two reasons provided in the record. On appeal now, they say it was rehabilitation, but there's absolutely nothing in the record to support that, and this is not rational basis review. This is outgoing speech, and under Martinez, you don't get to invent post-hoc reasons during litigation. Well, is it an objective inquiry or a subjective inquiry? Your Honor, I think it's subjective. I think we have to look in the record. I mean, Your Honor, because Martinez involves tailoring, this is the same as the Court does in other constitutional analyses. This is like in United States v. Virginia, where Justice Ginsburg said you can't invent post-hoc rationalizations for things like heightened scrutiny. In rational basis, yes, we allow, and if this Court thinks it's Turner, they could look to rehabilitation as a reason, but I think if this is, and I don't think there's any dispute that this is outgoing speech, so I think Martinez applies, and I think if Martinez does apply, I think we have to look to the record, and even if this Court is in Turner land, this Court's decision in Swift v. Lewis, I think, suggests that the actual basis still matters, because one, it might suggest pretext, or two, it simply might suggest that there was no legitimate reason to begin with. You know, as I understand— Let me ask you— Oh, go ahead, please. Going under Martinez, in Martinez, it talks about any regulation or practice that restricts inmate correspondence has to be necessary to protect one or more of the legitimate government interests, and then they talk about those identified above that were specific to Martinez. In your view, what is the purported government interest that the prison offers here, other than reputation, which we've now disposed of? Your Honor, I think that proves the point. I think the only interest we have in the record is at ER 104 and ER 113, neither of which they defend on appeal, and I think that helps us for qualified immunity as well, because no reasonable officer would have thought these legitimate reasons. In fact, they don't even attempt to defend those reasons on appeal, which I think helps our case. Now, what they do say on appeal is that it's rehabilitation, but even— Again, I think we don't get to that inquiry, but even if we start looking at rehabilitation, I think that still fails for a number of reasons. Let me ask you this. As I understand it, the prison concedes that if he were to send it to other publications other than En-ROADS, he could do so. Is that right? So, I don't think that matters for a number of reasons, but to answer the direct question, I don't think that's clear in the record. So, one, I don't think it matters. I think it fails the first half of Martinez. Two, on lesser restrictive alternatives, which your question goes to— Well, no, that's not what my question goes to. My question goes to, well, if he can send it to other places, why can't he send it to En-ROADS? Because they barred him from doing so. I think— No, you didn't understand the thrust of my question. If he can send it to other publications, what's their justification for not allowing him to send it to En-ROADS? Oh, exactly, Your Honor. I mean, that was one of the points we made in our brief, and I totally agree the fact that them saying rehabilitation, it's unclear how rehabilitation could be triggered, sending to En-ROADS, but not to The New Yorker, for example. And it's unclear how any of the other justifications would stand— Negative publicity as well. I mean, I think this is, I think your point, the point I was trying to make on top of that point, Your Honor, which is, I think you read Superintendent Key's letter as a blanket ban. It's unclear why negative publicity wouldn't apply to any magazine. And again, then you plainly fail the second prong of Martinez, and I think any reasonable officer would know, again, when we get to the qualified immunity analysis, that you can't have a blanket ban on speech when Martinez requires the restriction to be no greater than necessary. Go ahead, Judge McEwen. Yeah, well, I don't know if En-ROADS actually is distributed to the prison, in other words, if it's sent back, but would you agree that even if we take your point that they couldn't I agree, Your Honor. I do think that's a different inquiry. I think that Turner would apply. This is not—it doesn't involve the third-party interest, First Amendment interest that Martinez discusses. So if there was a restriction on, let's say Mr. Grening did get his work published in En-ROADS and the prison did not want it to come back into its prison and be circulated, that restriction would be analyzed under Turner. Now, frankly, I think that would fail under Turner as well because— Well, isn't it true that if it is published in En-ROADS, he's entitled to get a couple of copies himself? So that is to say it would come back into the prison? Yes, Your Honor, but that's not the policy restriction that we're claiming violates the Constitution. Well, I'm just talking as a factual matter. It will come back into the prison. Yes, Your Honor. I believe there's actually a question of sometimes they get the copies and sometimes they don't. I think there's a record question there. But again, the prison can see—or the defendants can see on page two of their brief that this actually—this content would actually not violate any internal prison rules as well, which I think goes to the fact that there is not a legitimate interest involved when it wouldn't violate the prison's own internal policies. So, Counsel, to me, it seems like you're ignoring the fact that this is all part of a prison program, rehabilitation program. It's a writing program designed to help them get reintegrated into society. And so, I mean, for a number of reasons, that makes this distinguishable for Martinez. And, you know, primarily, number one, you're saying that it's not in the record that it's a rehabilitative purpose that they restricted it. But saying that it doesn't comply with the writing guidelines of the magazine is a rehabilitative purpose. If they're trying to train prisoners how to comply with instructions and things of that nature, by saying it doesn't comply, and rejecting it for that reason, that is a rehabilitative purpose. So, a couple of responses, Your Honor. So, number one, again, just because it's part of a volunteer program does not mean that it doesn't have to adhere to Martinez. That's just an unconstitutional condition, right? They can't— Well, it's not a pure free speech argument. It is a part of a structured program that the prison is allowed to administer as it wants. I agree, Your Honor. But I think that goes more to the interest prong of Martinez. There's a question of, is this outgoing speech? And again, everyone agrees that it is. The defendants concede in their brief that there is no control once it leaves the prison. The district court said this is ER 13. In fact, the defendants apply Martinez in page 46 and 47 of their brief. So, I don't think there's any argument that we are applying Martinez here. And so then once we're applying Martinez, the standard is substantial interest, no greater than necessary to serve that interest. And the policy here, which again, it's still unclear what the actual policy is, it appears on appeal for the first time they're claiming that it is Ms. Weiss's unbridled discretion to block anything leaving the volunteer program. Well, I mean, it seems plausible that a prison administrator can decide when something meets the prison program's guidelines. I mean, are we supposed to like administer that? I mean, under Martinez, if it is speech leaving the prison, it is heightened scrutiny. So, if it's about- I don't think that's right. That's why I don't think this is Martinez. I mean, a prison can administer a program, right? Say that the magazine is about like elephants, right? And you're supposed to write about elephants. And if he wrote about aardvarks, couldn't the prison program say, this is noncompliant with the program, and so therefore I'm not sending it out? No, Your Honor. If it is about, we would have to look at, the first question is, is this Martinez? Is this speech leaving the- Well, just answer my question. I don't think so. I'm not sure what- So, you're saying that if the prison program magazine is about elephants, that the prison, he has a First Amendment right to send an article about aardvarks to a magazine about elephants. Yes, Your Honor. I'm not sure what the, what would be the, I'm not sure what the government- Because it doesn't, then it's just totally defeating the rehabilitative purpose of the program. If the program is about writing, complying, and getting back, reintegrating into society, if he's not following the rules, then he's not, you know, fulfilling the purpose of the program. But I think that's getting the inquiry mixed up. The first question is whether it's Martinez. So if we're in, if we're talking about Martinez, then we have to analyze it under this court's longstanding precedent on that case, which is substantial interest and no greater than necessary. So I think, yes, there might be a situation where the interest goes down because it was a part of a volunteer program, which I think is getting to your point. And I, and I, I agree that the interest might be changed because it was in a program, but that doesn't mean it's not outgoing speech. And that the important part that Martinez made clear was it's triggering First Amendment interests of a third party. That is, that is the important First Amendment interest. They actually said, yes, of course, the prisoner has First Amendment interests, but the interest that we are concerned about, the reason it's triggering heightened scrutiny is actually because of the third party interest that is, is that the outgoing speech is being sent to whose, whose third, whose interest are you? So, so in this case, so it would be the magazine would be, it'd be, it'd be any, again, this is, it would be any person that you were sending speech to. So in this case, it might be Claire Wilson, the editor of inroads, trying to vindicate inroad magazines, First Amendment interest. That is, that is part of it. It's, it's both. It is both. Well, I think those, the, the, well, first of all, if that's true, then the prison didn't stop inroads. I mean, it has no authority over inroads magazine. Yes, Your Honor. The question is, can they screen? Can they, and they didn't. Can I interject a question? Because your, your, your time is running out. Yeah, your time is running. And I'd like to ask a question. My colleagues suggested that this would be inappropriate in the magazine because of its sexual reference. My understanding is that the magazine inroads actually does publish things with sexual references and that this would not necessarily be inconsistent with that. Is that correct? Yes, Your Honor. I don't, I think the, the argument that, again, I don't think we even need to reach that because I don't think that's the reason in the record. But if we reach the question of, of, you know, was this a children's magazine and what, what kind of stories were published? I think this is the exact opposite of a children's magazine. There was stories about rape. There's a parental advisory notification. So, right. So, so it appears that this is, would it even, would it even matter though, because the right is really the prisoner for the outgoing mail and inroads could decide yes or no we'll publish. Yeah, sure. Yes, Your Honor. The question is, is at the time of screening. And again, I think the policies on the books, getting back to Judge Bumate, Bumate's point, it's, it's the question of what is the prison blocking from leaving? What happens later is, is not part of inquiry. So I just want to make that point clear. I'll reserve the remainder of my time. We'll give you more time. Go ahead. I just have one question. And I know you'll get a little bit extra time, but it's the clearly established right vis-a-vis the qualified immunity question. Your Honor. So I think it's Martinez. And I think for all the, all the reasons that I said and I can, I can talk a bit more about it, but again, I want to make one just procedural point on that. That again, only goes to the damages claim for the censorship issue. We, even if we lose on qualified immunity, we still have injunctive and declaratory relief and they don't make a qualified immunity argument as to retaliation. Any more questions? Okay. Thank you. Thank you, Your Honor. Good morning. May it please the court assistant attorney general, Michelle Young, on behalf of the defendants here. This case is not about censorship and retaliation. It's about safety and rehabilitation. The department of corrections does not prevent inmates from complaining about or reporting anyone or anything to people or entities outside the prison. But when the department permits a voluntary rehabilitative program to be held inside its prison, it has the authority to impose regulations needed to keep people safe, the institution secure, and participants progressing toward rehabilitation. Assuming that rehabilitation and safety are justifications that had been advanced at a time when we can now consider them. How does this make this prison unsafe? So it makes, there are two different issues here. The first is the screening of Mr. Grenning's short story in the sexual content. That goes to the rehabilitative purposes. I asked how does it make it unsafe? The safety issue goes to his contacting Claire Wilson, who was a student volunteer. And there is a serious, important government interest in preventing volunteers and inmates from developing improper relationships. Wait a minute, where'd that come from? I think we're talking about two sentences in a story. No, this is, so Mr. Grenning, Superintendent Keyes' letter to Mr. Grenning was in response to Mr. Grenning violating the policy and writing directly to a student volunteer. That was prohibited. It had nothing to do with the content. That is to say what you say, writing to the volunteer, when he sent the story to En-ROADS, what you're referring to? Yes. Did he do it in person or did he just send it? He sent it through the mail. That's correct. So he didn't, it wasn't as though he had physical contact with this person. He just sent it through the mail. Right. That's prohibited. And why is that then a safety proposition that he sends something through the mail? So the safety proposition is that he's developing, he potentially could be developing an improper relationship with Ms. Wilson. And was there anything... Where does it say that? Where in the record do we look on that? About, I'm sorry, what part of that? About the policy or about, so Superintendent Keyes... For the implications of the policy that Judge Fletcher was discussing about what you just said, there would be a potential improper relationship. Where is that articulated? Okay, so that is in the volunteer policy which is in the record. And hold on just a second, I'll get you that reference. And then it's also in the volunteer handbook, which is also in the record. This is in Superintendent Keyes' letter, ER 113, which specifically talks about that it was, that this letter is in response to Grenning and Superintendent Keyes is very concerned about the fact that Mr. Grenning had written directly to a volunteer, which is prohibited. I did see that in the record. The one thing, though, it was on the volunteer side. I don't, there was nothing in the record that shows that he's, that prisoners are prevented from contacting volunteers. Is it, is there any? We didn't, we don't have that in the record. I think there is a policy, but it wasn't in the record because that wasn't an argument that was made below. However... And you want to put it in the record and make the argument now? No, we're basing it on the policy that is in the record. We're basing it on the volunteer handbook. We're basing it on the syllabus, which tells inmate participants that they are not allowed, that they cannot contact the volunteers. If they have any questions, they need to be asked in class, that they're not to be asking them outside. Point me to where, in what we do have in the records, they're not supposed to contact volunteers? We have it that they're, that in the context of this class. Can you point me to the language that's in the record? It's in the syllabus. And it just says... No, I'm asking you, where is the language? I'd like to read it. So the language is in the syllabus. I know. What is the language? What reference? Is that for like an ER site? The ER, it's ER 101 through 103. And the reference says, if you have any questions, be sure to ask them in class. We can't ask or answer any questions outside of the class context. Well, that's really not this case. And I mean, I go back to Ms. Wise's paper, this little yellow piece of paper. And initially she says, due to the sexual content, this writing submission is inappropriate for publication in En-ROADS that violates, that includes distribution to minors. Right. So you've got, we've got two issues. We've got... Let me ask my question if I might. So going back to that first issue, and I understand there's that issue plus the other that you've pointed out, but going back to that issue, in effect, Ms. Wise is deciding in advance that this is not appropriate for publication in En-ROADS, which is not really her role, but she's kind of acknowledging that this is outgoing mail to En-ROADS. So it seems to me that she's really directly invoking Martinez and then putting herself in the position of being an editor at En-ROADS, isn't she? So we have, the record is fairly clear. It's implicit, but it's clear that En-ROADS, that Claire Wilson and En-ROADS were on the same page with respect to the standard here. So we have ER 123... No, but that's not the point. We don't even know if it met the standard or not. It's not the prison's decision on the outgoing mail, it's En-ROADS. And it may or may not be published, right? Right. So the screening requirement, there was a standard that was imposed in this class, in the context of a class. This is not a prison-wide policy. It's in the context of a single class. And in this class, the standard was no sexual content. And we know that from the publication... How does that advance a rehabilitative purpose? Because inmates, we're trying to make them better neighbors when they get out. They need to and with standards. And in this case, Mr. Grenning did not comply with that. So you're suggesting that because it's in a prison program, there's heightened standards because they're trying to train heightened mores or rules for society? Right. So the Department of Corrections doesn't have any interest in making their inmates better creative writers. You just said that there was a policy that there's no sexual content for any of the writings, irrespective of whether it's sent out. Where do you find that? Just in the context of this class. And we know that. So what's the basis for that statement that you just made? The basis of the statement is that we've got the publication agreement, which is ER-106. We've got Claire's... I'm not talking about publication for the moment. I'm asking you because I heard you say, and maybe I misheard you, but I heard you say it was inappropriate to write anything in this class that had sexual content. Is that what you said? They could write it, but they couldn't discuss it, and it was not to go to inroads. So they couldn't discuss it in the class?  And so where's that policy stated? That is in ER-120... And could you read me the policy? 1-122. Could you read me the policy? The policy, it is an email from Ms. Weiss to Claire clarifying the standards, the behavioral standards. No, that's in respect to this case. You have to be talking about a pre-established policy. Is there any pre-established policy? It wasn't pre-established with respect to this class. And where was it pre-established? The email was sent before this litigation. And read me the email? I'm sorry, what was that? Could you read it to me? Yes. Ms. Weiss is clarifying that there's to be no... I think she says no violence. You're not reading it to me. I don't have it memorized, Your Honor. Oh, and you don't have it in front of you? I don't. I have the site. I can find it. Okay. Okay. Thank you. I'm sorry. Here, we've got a prison class that involves an educational program, voluntary, and the... So the prison situation here, this is not a blanket policy. This is not a blanket outgoing mail restriction. Brennan could have submitted his story to literally any other publisher in the world. He had that opportunity. He sent it to one of the few people he was not allowed to write to. And it had nothing to do with his story at that point. Superintendent Key was very concerned about the fact that he had written to a program volunteer, a student. And the prison policy restricts the interaction because of the reason of the potential for development of an inappropriate relationship, which jeopardizes institutional security, volunteer safety, and... So the one problem with that is that that was not articulated by the warden at the time. Well, he does... So what are we supposed to do with that? He does link his concern directly to Grenning's contact of the volunteer. So we know that. The language, I do have that language. I don't recall that. Yeah. So I do have that language. In that language, Superintendent Key says, you stated in your letter that you had to send your story directly to the university. This causes me concern as you have bypassed our processes. Policy does not allow for volunteers to accept any correspondence without prior approval. If you send any correspondence directly to a volunteer again, without prior approval, you will not be allowed to participate in this volunteer program. So he directly cites the safety. Right. He makes that a direct link. But the other reason he cites was the reputational harm. And you are not defending that on appeal, correct? No. And he actually says that's Wise's job. He's trying to explain to Grenning what Wise's role is. Now, we know that Wise had a lot greater role than that because we have her job description. But we also know that Wise did not restrict it based on... She did not reject it based on negative publicity. She based it on the sexual content, which aligns with all these other things that we have coming in and going out from inroads. And so Mr. Superintendent Key did make that statement, but it was only in the context of this one class. How do you square that then with the record which documents inroads, publishes on more than one occasion, a number of stories or submissions that have sexual content? So the publication agreement says that mature themes and adult language are usually okay, but that explicit content is not. And we would say that here we've got explicit content in that it's a description of a sex act, whereas talking about a rape or talking to somebody who's been a victim of a rape is a mature theme, not explicit content. And inroads felt, the university felt strongly enough about this proposition that they made all the authors sign the acknowledgement, accepting the fact that explicit content was not appropriate for their population, their audience. So isn't that a decision ultimately to be made by inroads? I mean, the story can go out and it either does or doesn't meet those criteria. Isn't that an inroads determination? So this is not Wise making the determination. This is Wise input. So the standard is set. No, but my question, maybe it's a yes or no question and then you have an explanation, but isn't ultimately the decision as to whether or not a submission meets the inroads criteria, isn't that a decision to be made by inroads? Yes, but with respect to whether or not an inmate is violating the standard, that is a rehabilitative purpose that the Department of Corrections is screening for. So it's not about Wise deciding what's going to be an inroads. It's about Wise saying, this is the standard that we set. We told you no explicit content. You included it. So it's coming back to you. Now, she didn't prevent it from going out at all. What if he had sent it out to some other publication? Would that have been fine? That would have been fine. So he could send it any place, any publication except inroads. He could send it to Playboy, for example. I'm sorry, what was that? He could send it to Playboy. He could have sent it to any, he could have sent it to Highlights magazine. But the issue here is this is a class. The department has a rehabilitative interest in the class. That's the reason they allow it to be held inside the prison, which is a security risk. And so they were trying to teach Mr. Grenning boundaries and compliance with standards. And they're talking about the rehabilitative process because it's in the prison. Tell me again whether or not it was inappropriate for him to have written this. I'm not yet talking about sending it out. Was this inappropriate for him to have written this in the class? No, I don't think so. I mean, so this is okay to write. He could write. The only problem is that he wanted to send it to this magazine. And it didn't comply with the program standards. So it didn't look right. If the program standards are talking about rehabilitation, how can he write it in the first place? What gives him the leeway to do that? Well, because he has the leeway to write whatever he wants to. The question is whether or not it's appropriate for the class, right? So if I'm an instructor in a class and I tell my students to write about a certain thing, and I tell them to exclude this content, they can write whatever they want to. But I'm not going to accept it for credit. And here we've got this screening process. Mr. Grenning circumvented that. Mr. Grenning included content. And so Ms. Wise returned it to him. Now, he sent it out. It went through the mailroom. It was not. Counselor, your colleague on the other side said that this rehabilitative purpose was not presented below. Do you agree with that? The rehabilitative purpose? Yes. Well, and you have to remember that we're dealing with a narrow record below because the inmate didn't make a lot of the same arguments that they're making now. Oh, I see. So to the extent that the... I believe that we did make the argument below that there was this rehabilitative purpose and that there was an important interest in establishing boundaries and compliance with regulations. And I believe that that was made in our argument below. But like I said, we were kind of dealing with... You know, it's a little bit iffy because our record below is so narrow. And we haven't complained about the fact that they've expanded their arguments. We think that that's inherent in appointing counsel. But could you... Would you also just, for our benefit, submit a 28-J letter as to where below this rehabilitative standard was put forth? It would have been in the motion for summary judgment. No, no, I meant if you would submit a 28-J letter and then it gives you a little time to look up the specific record site, that would be useful. I would be happy to do that. Thank you. Thank you, counsel. Thank you very much. We took you over. We'll give you three minutes, please. Your Honor, just on the rehabilitation point, I will say, I think they did generally refer to rehabilitation one of the filings below. I was more making the point it was not in the record as to the actual... Not a waiver point and more a point that it was not in the record for the justifications given by the prison in advance. So I'm not... She can still submit the 28-J, but I wanted to clarify. Thank you. That's helpful. That's helpful. On the Claire Wilson discussion, I just want to make two points. One, I don't think it's clear in the record that she is actually a volunteer. I believe in ER 174, Mr. Grenning claims she was not a volunteer, but I think... And so I'm not... She had some oversight capacity, but I'm not sure if she was an on-the-ground volunteer. At least that was not made clear in the record. But two, I think that's in opposite. So I think everyone agrees that these prisoners can submit publications to inroads. They were provided the publication agreement on ER 106, and it directly provides Claire Wilson as the name and the person for who they're supposed to submit them to. So I'm not sure how that's a violation of any policy. Either she was not a volunteer and it wouldn't have applied, or she was a volunteer and she plainly was exempted from that policy. So whatever that is, I don't... She's identified as WITC student director. Now, that means she's a director of students, or maybe she's a student who's a director. I don't know. Yes, I agree, Your Honor. I'm not sure that's clear in the record. And again, on ER 106, they're directed to submit any questions, inquiries, and I believe the publications themselves to her. So she would be exempted from that. The other point, back to Judge Bumate's question, I just want to make clear. I agree that if this was Airway Heights Correctional Facility paper, it would be a different inquiry entirely. But again, no one disagrees that this is outgoing speech. And so then we have a different... There's a different standard that we're applying. So I just... I agree with that. My distinction is really that it's part of a program, a rehabilitative program, and that gives them a little more leeway in that respect. So I agree. I just... Your Honor, I don't think it can be the case that... I think then it just becomes the unconstitutional condition question, which is if you sign up for this program and you want to send out anything, any speech, we can block you for any reason. That's essentially... Well, to the program's magazine, yes. What's wrong with that? Again, but Your Honor, these are sort of somewhat distinct entities. And this goes to the Martinez question. No one disagrees that this is a third party. So we are applying Martinez. They've conceded that. And so I think... I have to ask if that's true. So I think we're mixing around the inquiry there. I think they've conceded it's a third party. I don't think they've conceded it's Martinez. Yes, Your Honor, I... Well, I think Martinez answers that question. So... And then lastly, Your Honor, this question of the policy that was being discussed, again, I don't think they've ever pointed to a specific policy. I think that is still unclear in the record. And I think that certainly helps our... Certainly, at least in the as-applied challenge. And then lastly, Your Honor, if this court has any concern, I would point them back to Barrett v. Bellock, where this court remanded at least for the district court to consider Martinez in the first instance where they had only made Turner arguments below. Thank you, counsel. Thank you, Your Honor. And thank you for your pro bono representation here. Both sides did a fine job.
judges: McKEOWN, FLETCHER, BUMATAY